**BURSOR & FISHER, P.A.**
Philip L. Fraietta (Bar No. 354768)
Matthew A. Girardi (*pro hac vice*)
50 Main St., Suite 475
White Plains, NY 10606
Tel.: (914) 874-0708
Fax: (914) 206-3656
E-mail: pfraietta@bursor.com
mgirardi@bursor.com

**BURSOR & FISHER, P.A.**
Spencer N. Migotsky (*pro hac vice*)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel.: (646) 837-7150
Fax: (212) 989-9163
E-mail: smigotsky@bursor.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

Theresa Downward, individually and on behalf of all other persons similarly situated,

Plaintiff,

v.

PHE, INC.,

Defendant.

Case No. 3:25-cv-09349-WHO

**FIRST AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Theresa Downward ("Plaintiff") files this first amended class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Defendant PHE, Inc. ("Defendant"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

**NATURE OF THE ACTION**

1. This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.adameve.com (the "Website"), a website Defendant owns and operates.

2. Through its Website, Defendant markets and sells sex toys, lingerie, bondage equipment, lubricants, and more (the "Products").

3. Few things are more private than information related to an individual's sexual preferences, as they can often reveal inherently sensitive details about their sexual orientation as well as conditions related to their sexual health.

4. Unbeknownst to consumers, however, Defendant collects such information when they visit its Website, including personally identifiable information ("PII") and information related to visitors' sexual life, sexual preferences, and/or sexual orientation.

5. Defendant recognizes the desire for consumers to keep such information private, as evidenced through its representations of discrete online shopping.

6. The California legislature has also recognized the sensitivity of such information by enacting privacy laws to protect the very information Defendant disclosed here.

7. Despite such legal protections, and consumers' expectations of privacy, Defendant aids, employs, agrees, and conspires with various third parties to intercept such sensitive and confidential communications sent and received by Plaintiff and Class Members. Plaintiff brings this action for legal and equitable remedies resulting from these illegal actions.

**JURISDICTION AND VENUE**

8. The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class action

where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 members of the putative class, and Plaintiff, as well as most members of the proposed class, are citizens of different states than Defendant.

9. This Court has personal jurisdiction over Defendant under Ninth Circuit precedent because of its contacts with the forum state. First, by integrating the code that allowed a third party to wiretap communications, Defendant acted intentionally. Second, Defendant knew that the harm would be felt in California because Defendant received billing and mailing addresses each time a customer completed a purchase. Third, Defendant expressly aimed its conduct at California because Defendant, in the regular course of business, sells products through its interactive website and causes those products to be delivered to the forum. More specifically, through the Website, Defendant sells products to California residents and ships those products to their home addresses. Collectively, such factors are sufficient for the Court to exercise personal jurisdiction over Defendant. *See Herbal Brands, Inc. v. Photoplaza, Inc.*, 72 F.4th 1085 (9th Cir. 2023).

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## THE PARTIES

11. Plaintiff Theresa Downward. is an adult citizen of the state of California and is domiciled in Oakland, California.

12. Plaintiff Theresa Downward used Defendant's Website to discreetly purchase private, adult items. For example, on April 27, 2025, Plaintiff Theresa Downward purchased a Sunset Dreams Dildo and Chubby Fun Vibrator from Defendant's Website. Plaintiff Theresa Downward reasonably expected the details of these purchases to be kept private and not disclosed to third parties.

13. Plaintiff has an active Gmail account which she has maintained for numerous years. When registering for her Gmail account, Google required that Plaintiff provide her full legal name, date of birth, and gender. Every time Plaintiff accesses her Gmail account, Google collects information related to her IP address and electronic device (e.g., browser, operating system, screen

resolution, etc.) and stores it in a profile maintained by Google for targeted advertising purposes. Google also utilizes other features, such as generating specific User IDs, to track its users across web browsing sessions for identification purposes, as detailed below. Google utilizes all of these tracking features to build robust consumer profiles it can then leverage for targeted advertising purposes.

14. Pursuant to the systematic process described herein, Defendant assisted Attentive, Google, and Heap (the "Third Parties") with intercepting Plaintiff's communications, including those that contained PII and sensitive information about Plaintiff's sex life and private purchases. Defendant assisted with these interceptions without Plaintiff's knowledge, consent, or express written authorization.

15. By failing to receive the requisite consent, Defendant breached its duties of confidentiality and unlawfully disclosed Plaintiff's PII and information about their private online purchases, including information related to her sexual life and sexual preferences. Such acts are an egregious violation of Plaintiff's privacy rights.

16. Defendant PHE, Inc. is incorporated in North Carolina with its principal place of business at 302 Meadowlands Dr., Hillsborough, North Carolina 27278. Defendant owns and operates www.adameve.com, an e-commerce platform that sells adult sex toys nationwide. Defendant chose to embed the Third Parties tracking software on its Website and failed to receive consent from consumers, including Plaintiff, to use the tracking software for targeted advertising purposes.

## **FACTUAL ALLEGATIONS**

### **A. Defendant Disclosed Sensitive, Private Information**

17. Defendant assisted multiple third parties with intercepting information that was sensitive, private, and personally identifiable.

18. Consumers have an expectation of privacy when it concerns private, consensual, adult activity. This is especially true when the disclosure of such information can reveal an individual's sexual preferences, sexual health, and/or sexual orientation.

19. Not only is this information confidential and sensitive, but it is also legally protected. Under the California Consumer Privacy Act of 2018, Cal. Civ. Code § 1798.140, *et seq*. ("CCPA"), "[a] business that controls the collection of a consumer's personal information shall, **at or before the point of collection**, inform consumers of … [t]he categories of personal information to be collected and the purposes for which the categories of personal information are collected or used and whether that information is sold or shared. A business shall not collect additional categories of personal information or use personal information collected for additional purposes that are incompatible with the disclosed purpose for which the personal information was collected without providing the consumer with notice consistent with this section." (CCPA § 1798.100, subd. (a)(1) [emphasis added].)

20. In addition, "[a] business that controls the collection of a consumer's personal information shall, **at or before the point of collection**, inform consumers of … [t]he length of time the business intends to retain each category of personal information, including sensitive personal information, or if that is not possible, the criteria used to determine that period provided that a business shall not retain a consumer's personal information or sensitive personal information for each disclosed purpose for which the personal information was collected for longer than is reasonably necessary for that disclosed purpose." (CCPA § 1798.100, subd. (a)(3) [emphasis added].)

21. Under the CCPA, "[p]ersonal information" means "information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household." (CCPA § 1798.140, subd. (v)(1).) Personal information includes, but is not limited to, the following if it identifies, relates to, describes, is reasonably capable of being associated with, or could be reasonably linked, directly or indirectly, with a particular consumer or household. (*See id.*) That specifically includes "[c]ommercial information, including records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies." (*Id.* at subd. (v)(1)(D).)

22. In 2020, California passed the California Privacy Rights Act, which expands the legal protections afforded by the California Consumer Privacy Act. This includes expanding the term "sensitive personal information" to include "[p]ersonal information collected and analyzed concerning a consumer's sex life or sexual orientation." Cal. Civ. Code § 1798.140(ae)(2)(C).

**B. Background of the California Information Privacy Act ("CIPA")**

23. The CIPA, Cal. Penal Code § 630, *et seq.*, prohibits aiding or permitting another person to willfully—and without the consent of all parties to a communication—read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from or received at any place within California.

24. To establish liability under Cal. Penal Code § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> Or
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> Or
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> Or
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

25. Section 631(a)'s applicability is not limited to phone lines, but also applies to "new technologies" such as computers, the internet, and email. *See Matera v. Google Inc.*, 2016 WL

8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' internet browsing history).

26. Under Cal. Penal Code § 637.2, Plaintiff and Class Members may seek injunctive relief and statutory damages of $5,000 per violation.

**C. Attentive and its Tracking Tools**

27. Attentive operates one of the largest marketing platforms in the country. "[O]ver 27% of the top 1,000 retailers in North America, including: 40% of the top apparel brands, 40% of the top jewelry brands, [and] 33% of the top health and beauty brands" utilize Attentive's marketing services.[1] Given Attentive's pervasiveness, the company has collected more than "1.8 billion email and phone numbers" and "1.4 trillion customer data points."[2]

28. To unlock the "full advantage" of its platform, Attentive requires retailers to integrate the "Attentive Tag" into their websites.[3] The Attentive Tag captures "behavioral data, page view, product view, add to cart, and purchase events."[4]

29. Through the Attentive Tag, Attentive "analyze[s] behaviors across the entire customer life cycle."[5] In exchange for that information, Attentive provides retailers with "a treasure trove of insights about [their] customers' shopping habits, like their browsing and purchasing history."[6]

---

[1] ATTENTIVE, RETAIL & E-COMMERCE, https://attentive.com/retail-ecommerce-marketing.

[2] ATTENTIVE, AUDIENCE MANAGER, https://www.attentive.com/audience-segmentation-manager.

[3] ATTENTIVE, THE ATTENTIVE TAG, https://help.attentivemobile.com/hc/en-us/articles/10905920909460-The-Attentive-tag.

[4] *Id.*

[5] ATTENTIVE, ANALYTICS, https://www.attentive.com/sms-analytics-and-reporting.

[6] ATTENTIVE, HOW TO MAKE THE MOST OUT OF YOUR WEB TRAFFIC, https://www.attentive.com/blog/web-traffic-optimization

30. Attentive collects and assimilates personal information into its "Identity Graph," which is a web of data built with multiple unique identifiers (e.g. cookies, phone numbers, email, on-site shopping behavior, device information, first name, last name, etc.) with the customer at the center."[7] Through the Identity Graph, Attentive offers retailers "a comprehensive customer profile."

**Figure 1:**




31. These profiles show various data points, like a consumer's "activities," "preferences," "[f]avorite products," and "[d]evices."

[7] ATTENTIVE, WHY ATTENTIVE SIGNAL IS THE KEY TO UNLOCKING TOP-PERFORMING CUSTOMER EXPERIENCES, https://www.attentive.com/blog/attentive-signal-faq.

**Figure 2:**




32. Each profile also contains tabs for "Subscriptions," "Activities," "Attributes," and "Offers."[8]

**Figure 3:**




[8] ATTENTIVE, VIEW SUBSCRIBER PROFILES, https://help.attentivemobile.com/hc/en-us/articles/4412398776724-View-subscriber-profiles.

33. The "Activities" tab reveals the content of the consumer's electronic communications.

**D. Google and Its Tracking Tools**

34. Google is one of the most valuable publicly traded companies in the world with a market capitalization of over $1 trillion dollars. Google fancies itself a "tech" company, but Google, at its core, is an advertising company.

35. Google "make[s] money" from "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and brand advertising."[9] In 2020, Google generated $146.9 billion in advertising revenue, which amounted to more than 80 percent of Google's total revenues for the year. Google generated an even higher percentage of its total revenues from advertising in prior years:

**Figure 4:**

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|---|---|---|---|
| 2021 | $257.6 billion | $209.5 billion | 81.33% |
| 2020 | $182.5 billion | $146.9 billion | 80.49% |
| 2019 | $161.9 billion | $134.8 billion | 83.29% |
| 2018 | $136.8 billion | $116.5 billion | 85.12% |

36. Google offers several analytics products, including SDKs and a tracking pixel, which exist solely to help drive ad revenue. For instance, Google's SDK and pixel integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products increasing Google's overall ad revenue. Products like Google's SDK and its tracking pixel also improve the company's advertising network and capabilities by providing more wholesome profiles and data points on individuals.

37. One of these SDKs and tracking pixels is Google Analytics. Google first launched a version of Google Analytics in 2005 as a tool for website traffic analysis. In 2007, Google

[9] ALPHABET INC., ANNUAL REPORT (FORM 10-K) (Feb. 2, 2021), available at https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

launched Google Analytics Synchronous code with new tracking functionality, such as the ability to track commerce transactions. Two years later, Google launched the Google Analytics Asynchronous code, which allowed webpages to load faster and improved data collection and accuracy.

38. Google continued updating its analytics platform, launching Universal Analytics in 2012. Universal Analytics offered new tracking codes and tools that provided more in-depth information about user behavior. Also, Universal Analytics enabled tracking the same user across multiple devices through its addition of the User-ID feature, which "associate[s] a persistent ID for a single user with that user's engagement data from one or more sessions initiated from one or more devices."

39. In 2020, Google launched Google Analytics 4, a platform combining Google Analytics with Firebase to analyze both app and web activity.

40. Since launching Google Analytics, Google has become one of the most popular web analytics platforms on the internet. Indeed, Google had a $62.6 billion increase in advertising revenues in 2021, compared to 2020, after launching its most recent version of Google Analytics.

41. Google touts Google Analytics as a marketing platform that offers "a complete understanding of your customers across devices and platforms."[10] It allows companies and advertisers that utilize it to "understand how your customers interact across your sites and apps, throughout their entire lifestyle," "uncover new insights and anticipate future customer actions with Google's machine learning to get more value out of your data," "take action to optimize marketing performance with integrations across Google's advertising and publisher tools," and "quickly analyze your data and collaborate with an easy-to-use interface and shareable reports."[11]

42. Google Analytics is incorporated into third-party websites and apps, including the Website, by adding a small piece of JavaScript measurement code to each page on the site. This code immediately intercepts a user's interaction with the webpage every time the user visits it,

---

[10] *Analytics*, GOOGLE, https://marketingplatform.google.com/about/analytics/

[11] *Id.*

including what pages they visit and what they click on. The code also collects PII, such as IP addresses and device information related to the specific computing device a consumer is using to access a website. The device information intercepted by Google includes the consumer's operating system, operating system version, browser, language, and screen resolution.

43. Once Google's software code collects the data, it packages the information and sends it to Google Analytics for processing. Google Analytics enables the company or advertiser to customize the processing of the data, such as applying filters. Once the data is processed, it is stored on a Google Analytics database and cannot be changed.

44. After the data has been processed and stored in the database, Google uses this data to generate reports to help analyze the data from the webpages. These include reports on acquisition (e.g., information about where your traffic originates, the methods by which users arrive at your site or app, and the marketing efforts you use to drive traffic), engagement (e.g., measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visits, and demographics (e.g., classify your users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities).

45. In addition to using the data collected through Google Analytics to provide marketing and analytics services, Google also uses the data collected through Google Analytics to improve its ad targeting capabilities and data points on users.

46. The Website utilizes Google's pixel and SDK. As a result, Google intercepted consumers' interactions on the Website, including their confidential PII. Google received at least "Custom Events" and URLs that disclosed the specific purchases made by the consumers. Google also received additional PII, including the consumers' IP address, device information, and User-IDs.

47. Google collects vast quantities of consumer data through its tracking technology.

48. Due to the vast network of consumer information held by Google, it is able to match the IP addresses, device information, and User-IDs it intercepts and link such information to an individual's specific identity.

**E. Heap and Its Tracking Tools**

49. Heap wiretaps the Website with its tracking technology[12], which Defendant purposefully installed.

50. Heap's tracking technology sends secret instructions to a Website user's browser without alerting the individual that this is happening. The tracker then causes the browser to secretly and simultaneously duplicate the user's Website communications, transmitting these communications to Heap's servers alongside additional information about the Website user's identity. This entire process occurs within milliseconds. In other words, when a user communicates with Defendant's Website, those communications are simultaneously and contemporaneously duplicated and sent to Heap at the same time as they are being sent to Defendant. Thus, Heap's interception of these communications occurs "in transit." *See, e.g.*, *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020) ("Permitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion . . ."); *James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 961 (N.D. Cal. 2023) (finding in-transit interception was alleged based on similar process to the one alleged herein).

51. Heap's tracking technology intercepts consumers' activities on websites and mobile applications into which the tracking technology has been integrated.[13] Heap explains its tracking

[12] *See, e.g.*, HEAP, INSTALLATION, https://developers.heap.io/docs/web ("To get started with Heap, paste the following code snippet …"); *see also* HEAP, IOS UIKIT QUICK START, https://developers.heap.io/docs/ios ("To enable Heap and start automatically tracking supported user events, register the autocapture SDK …").

[13] *See* HEAP, AUTOCAPTURED DATA, https://help.heap.io/hc/en-us/articles/18700150592924-Autocaptured-Data ("Heap's power comes from automatically capturing a wealth of user interactions in your app, which are classified as events and properties.").

technology allows Heap to collect "all the data on your customers[.] **What they click. Where they go. What they do, even when you're not looking**."[14]

52. Defendant chose to integrate Heap tracking technology into the Website by intentionally placing the Heap code therein.[15]

53. Heap advertises that its tracking technology collects "data [that] is organized into [a] hierarchy . . . where users belong to accounts, users have many sessions, sessions include pageviews, and during those pageviews, events occur."[16]

54. Activities that Heap intercepts and/or otherwise obtains via the Website include, but are not limited to, users' button clicks and page views.[17]

55. Heap also collects what it calls "sessions." Sessions encompass both "pageviews" and "events." Heap further explains that "[a] session in Heap is a period of activity from a single user in your app or website. It can include many pageviews or events." Session "properties" include but are not limited to "User ID", meaning "[t]he ID of the associated user[;]" "[p]latform", meaning "[t]he user's operating system[,]" and "[c]ountry" and "[r]egion, based on [users'] geolocation data."[18]

56. Once Heap collects the activities that patients take on the Website, Heap processes the activities and then allows clients like Defendant to analyze that data.

---

[14] HEAP, HOW HEAP WORKS, https://www.heap.io/why-heap/how-heap-works (emphasis added).

[15] *See* HEAP, INSTALLATION, https://developers.heap.io/docs/web ("To get started with Heap, paste the following code snippet …"); *see also* HEAP, IOS UIKIT QUICK START, https://developers.heap.io/docs/ios ("To enable Heap and start automatically tracking supported user events, register the autocapture SDK …").

[16] HEAP, AUTOCAPTURED DATA, https://help.heap.io/hc/en-us/articles/18700150592924-Autocaptured-Data (last accessed June 2, 2025); *see also* HEAP, *Episode 1: Autocapture*, https://www.heap.io/why-heap/how-heap-works.

[17] *See* HEAP, AUTOCAPTURED DATA, https://help.heap.io/hc/en-us/articles/18700150592924-Autocaptured-Data.

[18] HEAP, SESSION PROPERTIES, https://help.heap.io/hc/en-us/articles/18700150592924-Autocaptured-Data#session-properties.

57. Specifically, Heap provides for analysis through segments[19], dashboards[20], charts[21], and playbooks[22]. Segments allows clients like Defendant to, inter alia, "target[] behavior-driven cohorts in marketing suites[.]"[23] Dashboards allow clients to "drive measurable business outcomes by letting you custom group relevant charts."[24] Charts "are saved analysis results . . . . For example, . . . to track pageviews and searches[.]"[25] Clients can even "export a chart" to "Google Sheets[.]"[26] And charts are important because clients can use them to "[g]raph conversion events, build funnels, track retention, and figure out which growth levers influence [Defendant's] business the most."[27] Additionally, Defendant can "track[] key behaviors" by using "Playbooks [which] are pre-built dashboard templates, customized by industry, that let you generate charts and see relevant insights faster than ever."[28] For example, Heap's dashboards allow "access to . . . user demographics" and "product engagement."[29]

58. Thus, Heap provides Defendant with the ability to further optimize and monetize its Website.

59. When Heap uses its wiretap on Website users' communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. Instead, Heap—a separate and distinct entity from the parties to the conversations—uses the wiretaps to eavesdrop upon, record, extract data from, and analyze conversations to which it is not a party. Heap itself, collects the

---

[19] HEAP, SEGMENTS, https://www.heap.io/platform/segments.

[20] HEAP, DASHBOARDS, https://www.heap.io/platform/dashboards.

[21] HEAP, CHARTS, https://www.heap.io/platform/charts.

[22] HEAP, PLAYBOOKS, https://www.heap.io/platform/playbooks.

[23] *Supra* note 21.

[24] *Supra* note 22.

[25] HEAP, CHARTS OVERVIEW, https://help.heap.io/hc/en-us/articles/18699972739612-Charts-Overview.

[26] *Id.*

[27] *Supra* note 21.

[28] *Supra* note 22.

[29] *Id.*

contents of said conversations. That data is then analyzed by Heap before being provided to any entity that was a party to the conversations (like Defendant).

60. Heap has the capability to use the contents of conversations it collects through its wiretaps for its own purposes.

**F. Defendant's Website and Use of the Tracking Technologies**

61. Defendant is a global online retailer of adult products. By its own description, Defendant "is the leading sex toy company in the USA."[30]

62. Defendant's Website is accessible on mobile devices and desktop computers.

63. Unbeknownst to consumers, Defendant aids third parties, including but not limited to Heap, Attentive, and Google with monitoring and tracking consumers' personal information as they navigate Defendant's Website. This includes information concerning consumers' sexual life, sexual preferences, and sexual orientation.

64. For example, when a consumer navigates Defendant's Website and selects the "Gay Toys" tab under the "For Men" page link, Defendant aids Third Parties in intercepting that information:

**Figure 5:**




65. Defendant does the same for all button clicks on its Website, which includes information that relates to a consumer's sexual preferences, orientation, and health.

---

[30] https://adameve.com.

66. Such tracking includes each and every Product purchased by consumers on Defendant's Website, including products relating to sexual health.

67. Third Parties then leverage this information and sell it to other outside parties for targeted advertising purposes, as described below.

### 1. Attentive's Tracking

68. Defendant integrated into its Website code from Attentive—including but not limited to the Attentive Tag—for the purpose of "capturing behavioral data" and linking it to personally identifiable information.

69. When consumers access and navigate www.adameve.com, Attentive's software script surreptitiously directs the user's browser to send a separate message to Attentive's servers. This second, secret transmission contains the original GET request sent to the host website along with the additional data that Attentive's code is configured to collect. This transmission is initiated by Attentive's code and concurrent with the communications made to the host site. Two sets of code are thus automatically run as part of the browser's attempt to load and read Defendant's Website—Defendant's own code, and Attentive embedded code.

70. Defendant integrated into its Website code from Attentive—including but not limited to the Attentive Tag—for the purpose of "capturing behavioral data" and linking it to personally identifiable information, as shown below:

**<u>Figure 6:</u>**

| | |
|---|---|
| v | 4.40.57 |
| r | https://www.adameve.com/shoppingcart.aspx |
| id | c48fac054cfb47ffab64714541fa3c8f |
| pv | 9 |
| l | https://www.adameve.com/adult-sex-toys/gay-sex-toys-ch-1004.aspx |
| w | 1165 |
| h | 1305 |
| ss_ref | https://www.adameve.com/checkout/shippingandbilling |
| a | {"clientId":"1676712931.1758032792","sourceChannel":"gn","orderSourceCode":"WEBGEN1","sessionId":"1758219748","timestampMicros":175 8222211613000} |
| s | PHE_CUSTOMER |
| hasEmail | true |
| f | 3 |

71. As shown in Figure 6, Attentive intercepts and records the checkout events for consumers purchasing products on Defendant's Website. The information intercepted by Attentive

also includes each customer's order number, checkout confirmation, and total cost of their purchase.

72. Attentive also intercepts and records a hashed version of each consumer's email address to link their Website activity to a profile maintained by Attentive.

**2. Google's Tracking**

73. Google's tracking technology operates in a similar manner.

74. When consumers navigate Defendant's Website, Google's tracking technology intercepts and records all of their private activity, including the private products they purchase:

**<u>Figure 7:</u>**




75. Google intercepts additional information, including the customer's order number, checkout confirmation, and total cost of their purchase.

76. Defendant further assists Google by disclosing the PII of its customers sufficient for Google to uncover their identities. In the HTTP communication shown in Figure 7, the individual's IP address is inherently included in every network request. In addition to its customers' IP addresses, Google intercepted and recorded information about their specific devices

and User-IDs, allowing Google to link such information to an individual's specific identity.

77. As shown above, Plaintiff's communications with Defendant were intercepted in transit by Google, in real time, via detailed URLs, which contain the private information entered into the Website.

78. Defendant also uses and causes the disclosure of data sufficient for Google to create a browser-fingerprint identifier with each re-directed communication described herein, including communications concerning individual's legally protected purchasing information.

79. Defendant sent these identifiers (e.g. ecid, auid, guid, IP address, and device information) with each individual's "event" data.

80. This includes when consumers make purchases that reveal information about their sexual preferences, orientation, and health.

**3. Heap's Tracking**

81. Through the Heap tracking technology, wiretapped data taken from the Website is paired with user's identities.

82. Heap "uses deterministic and probabilistic tracking" to "track individual user's journeys across multiple devices."[31] "When this person logs in, [then Heap] recognize[s] their internal user ID"[32] via "Heap's identify API, . . . [which] tells [Heap] that these users are the same, and that [it] should join their data together."[33]

83. "Internally, [Heap] call[s] this a 'user migration' because [it is] migrating user and event data from one record to another. In other words, [Heap] resolv[es] data from two [anonymous] users into one identity. This is identity resolution, at a high-level."[34]

84. Thus, Heap collects "granular, user-level data of how people are interacting with

---

[31] *How Cross-Device Tracking Helps Drive Growth for your Business*, HEAP, https://www.heap.io/topics/cross-device-tracking.

[32] *Id.*

[33] *Heap Connect: Identity Resolution (S3 only)*, HEAP, https://help.heap.io/hc/en-us/articles/18700033430684-Heap-Connect-Identity-Resolution-S3-only.

[34] *Id.*

[the] site [and] app. It presents a list of users . . . [and f]or each user listed, Heap shows . . . all their events grouped by sessions . . . . At the top of each user's entry is their unique identifier, . . . [attached] via [the Heap] Identify API."[35]

85. Defendant assisted Heap with intercepting consumer information, including when it concerned information related to consumer's private sensitive information sexual preferences, orientation, and health.

86. To illustrate, Heap's software script surreptitiously directs the user's browser to send a separate message to Heap's offsite servers when interacting with Defendant's "wheel" feature.

**Figure 8:**

▾ **Query String Parameters** View source View URL-encoded

| | |
|---|---|
| url | https://www.adameve.com/adult-sex-toys/gay-sex-toys-ch-1004.aspx |
| uid | w-ml_I--NVCJuCHSPRWTPw |
| v | 1 |
| host | https://www.adameve.com |
| l_src | www.google.com |
| l_src_d | 2025-09-18T14:44:21.363Z |
| u_src | |
| u_src_d | |
| shop | false |

87. Heap intercepts additional information from customers as well, including their full names, home address, order number, checkout confirmation, and total cost of their purchase. Heap intercepts this information as the customer enters it into Defendant's Website.

88. Heap records and matches this activity, including purchasing activity, to individual profiles it maintains for each specific individual.

[35] *Users Overview*, HEAP, https://help.heap.io/hc/en-us/articles/18980579856796-Users-Overview.

### G. Plaintiff Never Provided Defendant or the Third Parties with Consent to Intercept Their Sensitive and Confidential Information

89. Plaintiff and members of the putative Class never consented, agreed, authorized, or otherwise permitted Defendant to assist the Third Parties in intercepting and recording their confidential and sensitive personal information. In fact, such activity contradicts explicit privacy representations Defendant makes on its Website:

**<u>Figures 9 and 10:</u>**







90. Defendant's conduct, as detailed herein, flies in the face of its own representations and legal duties to protect such private and sensitive information.

## <u>CLASS ACTION ALLEGATIONS</u>

91. Plaintiff brings this action as a class action under Federal Rule of Civil Procedure 23 on behalf of a class consisting of all persons in California who have a Gmail account and who purchased a product on www.adameve.com (the "Class").

92. Plaintiff reserves the right to modify the class definition or add sub-classes as necessary prior to filing a motion for class certification.

93. The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement.

94. Excluded from the Class is Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer, director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his/her spouse and immediate family members; and members of the judge's staff.

95. <u>Numerosity/Ascertainability</u>. Members of the Class are so numerous that joinder of

all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiff at this time; however, it is estimated that there are at least thousands of individuals in the Class. The identity of such membership is readily ascertainable from Defendant's records and non-party Google's records.

96. Typicality. Plaintiff's claims are typical of the claims of the Class because Plaintiff used www.adameve.com and had their sensitive information disclosed to Third Parties without their express written authorization or knowledge. Plaintiff's claims are based on the same legal theories as the claims of other Class members.

97. Adequacy. Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation, generally, and in the emerging field of digital privacy litigation, specifically. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Class.

98. Common Questions of Law and Fact Predominate/Well Defined Community of Interest. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Class include:

(a) Whether Defendant intentionally assisted a third party with tapping the lines of internet communication between itself and customers;

(b) Whether Defendant assisted a third party with surreptitiously recording personally identifiable information, sensitive personal information, and related communications;

(c) Whether Google was a third-party eavesdropper;

(d) Whether Attentive was a third-party eavesdropper;

(e) Whether Heap was a third-party eavesdropper;

(f) Whether Defendant's disclosures of personally identifiable information, sensitive personal information, and related communications constituted an affirmative act of communication;

(g) Whether Defendant's conduct, which allowed Third Parties—all unauthorized persons—to view Plaintiff's and Class Members' personally identifiable information and sensitive personal information, resulted in a breach of confidentiality;

(h) Whether Defendant violated Plaintiff's and Class Members' privacy rights by using the Third Parties tracking technologies to record and communicate their PII alongside their confidential communications;

(i) Whether Plaintiff and Class Members are entitled to damages under CIPA or any other relevant statute; and

(j) Whether Defendant's actions violated Plaintiff's and Class Members' privacy rights as provided by the California Constitution.

99. Superiority. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### COUNT I

### Violation of the California Invasion of Privacy Act, Cal. Penal Code § 631

100. Plaintiff repeats the allegations contained in the paragraphs above as if fully set

forth herein and brings this count individually and on behalf of the members of the Class.

101. The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638. CIPA begins with its statement of purpose – namely, that the purpose of CIPA is to "protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . ." Cal. Penal Code § 630.

102. A person violates California Penal Code § 631(a), if:

> by means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [s/he] uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained . . . .

Cal. Penal Code § 631(a).

103. Further, a person violates § 631(a) if s/he "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned" in the preceding paragraph. *Id.*

104. To avoid liability under § 631(a), a defendant must show it had the consent of <u>all</u> parties to a communication.

105. At all relevant times, Defendant aided, agreed with, and conspired with Third Parties to track and intercept Plaintiff's and Class Members' internet communications while accessing www.adameve.com. These communications were intercepted without the authorization and consent of Plaintiff and Class Members.

106. Defendant, when aiding and assisting Third Parties' wiretapping and eavesdropping,

intended to help those eavesdroppers learn some meaning of the content in the URLs and the content the visitor requested.

107. The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the various tracking technologies fall under the broad catch-all category of "any other manner":

a. The computer codes and programs the Third Parties used to track Plaintiff and Class Members' communications while they were navigating www.adameve.com;

b. Plaintiff's and Class Members' browsers;

c. Plaintiff's and Class Members' computing and mobile devices;

d. The Third Parties' web and ad servers;

e. The web and ad-servers from which the Third Parties tracked and intercepted Plaintiff's and Class Members' communications while they were using a web browser to access or navigate of www.adameve.com;

f. The computer codes and programs used by the Third Parties to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a browser to visit www.adameve.com; and

g. The plan the Third Parties carried out to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser or mobile application to visit www.adameve.com.

108. The information that Defendant transmitted using the Third Parties' tracking technologies constituted sensitive and confidential personally identifiable information.

109. As demonstrated hereinabove, Defendant violated CIPA by aiding and permitting third parties to receive its customers' sensitive and confidential online communications through www.adameve.com without their consent.

110. As a result of the above violations, Defendant is liable to Plaintiff and other Class Members in the amount of, the greater of, $5,000 dollars per violation or three times the amount of actual damages. Additionally, Cal. Penal Code § 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages." Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

**COUNT II**
**Violation of the California Invasion of Privacy Act**
**Cal. Penal Code § 632**

111. Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the Class.

112. The following items constitute "an electronic amplifying or recording device" under CIPA:

a. The computer codes and programs the Third Parties used to track Plaintiff and Class Members' communications while they were navigating www.adameve.com;
b. Plaintiff's and Class Members' browsers;
c. Plaintiff's and Class Members' computing and mobile devices;
d. The Third Parties' web and ad servers;
e. The web and ad-servers from which the Third Parties tracked and intercepted Plaintiff's and Class Members' communications while they were using a web browser to access or navigate of www.adameve.com;
f. The computer codes and programs used by the Third Parties to effectuate their tracking and interception of Plaintiff's and Class Members' communications while they were using a browser to visit www.adameve.com; and

g. The plan the Third Parties carried out to effectuate their tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser or mobile application to visit www.adameve.com.

113. The data collected on Defendant's website constitutes "confidential communications," as that term is used in Section 632, because Class Members had objectively reasonable expectations of privacy with respect to their sensitive personal information.

114. Defendant is liable for aiding and abetting violations of Section 632 by the third-party vendors.

115. Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class members have been injured by the violations of Cal. Penal Code § 635, and each seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

**COUNT III**
**Invasion Privacy Under California's Constitution**

116. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

117. Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential online communications; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and Class Members' knowledge or consent.

118. At all relevant times, by using the Third Party tracking technology to record and communicate their PII alongside their sensitive and confidential online communications, Defendant intentionally invaded Plaintiff's and Class Members' privacy rights under the California Constitution.

119. Plaintiff and Class Members had a reasonable expectation that their sensitive and confidential online communications, identities, and other data would remain confidential, and that Defendant would not install wiretaps on www.adameve.com.

120. Plaintiff and Class Members did not authorize Defendant to record and transmit Plaintiff's and Class Members' sensitive and confidential online communications.

121. This invasion of privacy was serious in nature, scope, and impact because it related to their sensitive and confidential online communications. Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

122. Accordingly, Plaintiff and Class Members seek all relief available for invasion of privacy claims under California's Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a. For a determination that this action is a proper class action;

b. For an order certifying the Class, naming Plaintiff as representatives of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

c. For an order declaring that Defendant's conduct violated the statutes referenced herein;

d. For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

e. For an award of compensatory damages, including statutory damages where available, to Plaintiff and the Class Members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

f. For punitive damages, as warranted, in an amount to be determined at trial;

g. For an order requiring Defendant to disgorge revenues and profits wrongfully obtained;

h. For prejudgment interest on all amounts awarded;

i. For injunctive relief as pleaded or as the Court may deem proper;

j. For an order awarding Plaintiff and the Class their reasonable attorneys' fees and

expenses and costs of suit; and

k. For an order granting Plaintiff and Class members such further relief as the Court deems appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of herself and the proposed Class, demands a trial by jury for all of the claims asserted in this Amended Complaint so triable.

Dated: February 11, 2026

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: /s/ *Philip L. Fraietta*
Philip L. Fraietta

Philip L. Fraietta (Bar No. 354768)
Matthew A. Girardi (*pro hac vice*)
50 Main St., Suite 475
White Plains, NY 10606
Tel.: (914) 874-0708
Fax: (914) 206-3656
E-mail: pfraietta@bursor.com
mgirardi@bursor.com

**BURSOR & FISHER, P.A.**
Spencer N. Migotsky (*pro hac vice*)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel.: (646) 837-7150
Fax: (212) 989-9163
E-mail: smigotsky@bursor.com

*Counsel for Plaintiff*